UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMAS STEPHEN DRUMMOND,<br><br>Plaintiff,<br><br>v.<br><br>MARTIN O'MALLEY, Commissioner of Social Security,[1]<br><br>Defendant. | Case No.  1:23-cv-00942-JLT-BAM<br><br>**FINDINGS AND RECOMMENDATIONS REGARDING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>(Docs. 15, 19) |

**INTRODUCTION**

Plaintiff Thomas Stephen Drummond ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance under Title XVI of the Social Security Act.  The parties' briefing on the motion was submitted, without oral argument, to Magistrate Judge Barbara A. McAuliffe for findings and recommendations.  (Docs. 15, 19, 20.)  Having considered the parties' briefs, along with the entire

---

[1] Martin O'Malley became the Commissioner of Social Security on December 20, 2023. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Martin O'Malley is substituted for Kilolo Kijakazi as Defendant in this suit.

1

record in this case, the Court finds that the decision of the Administrative Law Judge ("ALJ") was not supported by substantial evidence in the record and was not based upon proper legal standards. Accordingly, this Court will recommend reversing the agency's determination to deny benefits and remanding the matter for further proceedings consistent with this order.

## FACTS AND PRIOR PROCEEDINGS

Plaintiff applied for Title XVI Supplemental Security Income on September 18, 2020, alleging that he became disabled on September 14, 2002. AR 210-20. That claim was denied initially on January 22, 2021, and upon reconsideration on June 22, 2021. AR 122-32. Plaintiff requested a hearing before an administrative law judge ("ALJ") and ALJ William Manico held a hearing on January 13, 2022. AR 50-74. ALJ Manico issued an order denying benefits on the basis that Plaintiff was not disabled on May 26, 2022. AR 29-49. Plaintiff sought review of the ALJ's decision, which the Appeals Council denied. AR 1-6. This appeal followed.

**January 13, 2022 Hearing Testimony**

ALJ William Manico held a hearing on January 13, 2022. AR 51-74. Glee Ann Kehr, an impartial vocational expert, also appeared and testified. AR 69-73. Plaintiff's attorney Lars Christenson was also present. Plaintiff's great-aunt and cousin were also present in the room with Plaintiff. AR 54. The ALJ began by admitting exhibits into evidence, and Plaintiff's attorney did not object and stated that there were no outstanding records. AR 52. Plaintiff's attorney stated that there was no direct opinion evidence or formal medical opinions that he wanted to highlight, though there were some teacher questionnaires and a school assessment that Plaintiff's attorney highlighted. AR 53.

Under examination by the ALJ, Plaintiff testified that it was difficult for him to get along with others and that he had social difficulties. AR 55. He said that his concentration was poor and that he had never worked. *Id.*

Upon examination by Plaintiff's attorney, Plaintiff said that he understood that Plaintiff's attorney would be asking about Central Valley Regional Center (CVRC). *Id.* Plaintiff's attorney then informed the ALJ that there were no outstanding records that he was aware of and that the CVRC

records were Exhibit 9F. AR 56. Plaintiff testified that he went to CVRC because he could not function on his own and needed help. *Id.* Plaintiff said that he could take care of personal hygiene, bathe, shower, and dress on his own. *Id.* Plaintiff said that he needed help trying to find his skills on a job and understanding the job. *Id.* He also said that he did not have a driver's license and did not try to get a driver's license because he had anxiety and would not be able to drive. *Id.* Plaintiff confirmed that the CVRC report stated that he needed someone to help guide him, watch what he was doing, and to help him know what to do. AR 57. Plaintiff said that he needed daily help from his family. *Id.* The ALJ and Plaintiff's attorney discussed who was in the room with Plaintiff, and Plaintiff's attorney stated that his guardian Cheri Manuck acted as Plaintiff's surrogate mother since Plaintiff was six years old. *Id.* The ALJ then stated that Plaintiff's attorney could call Plaintiff's guardian as a witness. AR 57-58.

Upon examination by the ALJ, Ms. Manuck stated that she had raised Plaintiff from three years old to six years old, then her mother took over from six onward. AR 58. Ms. Manuck stated that she began helping care for Plaintiff three years prior to the hearing because Plaintiff was not getting the help he needed, and she was more familiar with the resources available. *Id.* Ms. Manuck said that the case was delayed because her mother did not have access to resources. AR 59. Ms. Manuck said that while her mother was caring for Plaintiff, she was not living in the household but was in regular contact and made regular visits from the Bay Area. *Id.* Ms. Manuck stated that Plaintiff was not able to tell time, was not able to give change, and was not able to follow many directions given to him even if they were written down. AR 59-60. She also said that he was "very antisocial" and it was "like pulling teeth getting him to talk." AR 60. She said that his anxiety level is high, he would not initiate conversation, and she worried that without her and her mother caring for him, Plaintiff would not be able to take care of himself. *Id.* The ALJ then asked Plaintiff's attorney whether there were any opinions in the counseling record that reflected Plaintiff's inability to care for himself. *Id.* Plaintiff's attorney said that Exhibit 9F purported an inability to live independently and the CVRC helped him to develop those skills. *Id.* Ms. Manuck stated that there were not more records from CVRC because they were not able to get Plaintiff into that program before. AR 60-61. She said that her mother had previously tried when Plaintiff was in elementary school but was not able

to get him into CVRC. *Id.* Ms. Manuck added that there were minimal records because there were no assessments done and the school "just passed him on" and allowed him to graduate despite being at a second-grade math and reading level and being unable to tell time or give change for two dollars. AR 61. Ms. Manuck said that the records available were ones that she and her family were able to obtain in the prior three years. *Id.*

The ALJ then asked the VE to interpret the statement "'If Thomas is interested in public sector employment, he will use generic resources, such as the Porterville Job Club. But if he can't find employment in the public sector, he can opt to work through the Porterville Sheltered Workshop" and determine whether Plaintiff was limited to working in a sheltered workshop. AR 62. The VE testified that a job club involves job coaching and helping someone perform a competitive job with significant supports. *Id.* The VE added that if Plaintiff were to attempt a competitive job with a job coach, which would still be sheltered work, the next step would be getting into a sheltered workshop. *Id.* The VE noted that generally, at least in the state of Illinois, people would need to be at a fairly low level of functioning to qualify for sheltered workshop work or to obtain state-funded job club or job coaching services. *Id.* Plaintiff's attorney clarified that the report was from counselor Pamela Chadwick. AR 63. Plaintiff's attorney further added that Plaintiff's family were reaching out to additional resources to see what options existed, and that there was an assessment pending with the Department of Rehabilitation and a sheltered workshop. *Id.* Plaintiff's attorney noted that "all of the records that would be nice to have for the file are not currently present" due to those delays. *Id.* Plaintiff's attorney further stated that the CVRC evaluation was consistent with the school evaluation finding a full scale IQ of 71 with some executive functioning deficits, which was inconsistent with the CE evaluation showing a full scale IQ of 84. AR 64. He further stated that Plaintiff performed with an IEP but had significant limits consistent with the teacher questionnaires that discuss Plaintiff not working in groups and not responding. *Id.*

Ms. Manuck stated that Plaintiff takes psychological medication prescribed by his psychiatrist, Dr. Parr. *Id.* Plaintiff's great-aunt stated that Plaintiff had started seeing Dr. Parr approximately a year ago, and he had seen another doctor for four or five years prior to that. AR 64-65. Plaintiff's attorney said that efforts were made to get a mental RFC or opinion statement from Plaintiff's

4

psychiatrist, but Plaintiff's family had not obtained a statement. AR 65. Plaintiff's attorney noted that CVRC had become involved more recently and it was not typical for someone to become a CVRC client that late in life, so Plaintiff and his representatives were trying to collect what was needed. AR 66.

Under examination from Plaintiff's attorney, Ms. Manuck stated that Plaintiff had recently done an initial assessment with the Supported Employment Group. *Id.* She testified that the Supported Employment Group representative outlined Plaintiff's options and a referral was made with Plaintiff's case manager for the Department of Rehabilitation. AR 66-67. Ms. Manuck testified that Plaintiff would have difficulties in accepting instructions, completing tasks, and getting things done timely. AR 67. She also said that Plaintiff would appear to understand the directions as they were given, but when left unattended, he would not follow the instructions. *Id.* Ms. Manuck testified that there was no communication and Plaintiff had some comprehension problems. *Id.* She said that Plaintiff would be assigned chores at home, but she and others would constantly need to remind him to do them if they were not done at that moment. *Id.* Ms. Manuck testified that Plaintiff would do the chores at his own pace and noted that if he needed to take out two bags of garbage, he would take out one at a time rather than at the same time. AR 68. She testified that she would need to remind or correct Plaintiff between five and ten times per day regarding his assigned chores. *Id.* She said that when she reminded him, he was able to get back on task for approximately half an hour before it became a problem again. *Id.* Ms. Manuck also testified that Plaintiff was not always able to form words correctly and would get frustrated with himself and walk away rather than trying to make himself understood. *Id.* She said that his verbal communications were jumbled, and he was not always understood. *Id.* Ms. Manuck stated that Plaintiff was living with her at the time of the hearing.

Following Plaintiff's testimony, the ALJ elicited testimony from vocational expert ("VE") Glee Ann Kehr. AR 69-73. The ALJ asked the VE hypothetical questions. For the first hypothetical, the ALJ asked the VE to consider a hypothetical individual who: was a younger person with limited education and no past relevant work; had no physical restrictions related to any medically determinable impairments; retained the mental RFC to carry out unskilled work involving simple, routine, repetitive tasks, and that allowed for a regular work break approximately every two hours,

with the first break being about 15 minutes, the second break being about 30 minutes, and the third being about 15 minutes; retained the social interaction ability to perform work that involved working primarily with things rather than people; and retained the ability to deal with routine changes and stressors associated with the work described in that mental RFC.  AR 69-70.  The VE stated that appropriate jobs included: Packager (DOT No. 920.587-018, approximately 530,000 positions in the national economy, medium, unskilled, SVP 2); Machine Feeder (DOT No. 569.686-042, approximately 10,000 positions in the national economy, medium, unskilled, SVP 1); Machine Off-Bearer (DOT No. 920.685-074, approximately 314,000 positions in the national economy, medium, unskilled, SVP 2).  AR 70.  The VE stated that her testimony was consistent with the DOT and SCO. *Id.*  In response to a question from the ALJ, the VE stated that no more than 15 percent of off-task work time would be allowable, and that the increments of off-task time cannot be more than roughly five minutes per increment if time so that off-task time cannot be taken in one large chunk of time.  AR 71.  Ms. Manuck then stated that Plaintiff would be unable to concentrate on his work for more than 15 percent of a workday, outside of ordinary breaks.  AR 70-71.

Plaintiff's attorney then asked the VE to add to the first hypothetical that the individual would be limited to no more than a two-step instruction.  AR 72.  The VE testified that the impact of adding step limitations on job numbers was difficult to determine.  *Id.*  The VE stated that the jobs cited were some of the simplest jobs available, including the machine feeder, but noted that the individual would still need to be able to make sure that they put the right items into the machine and need to be able to make sure that items are not coming out of the machine more quickly than what they were able to take off of the machine.  *Id.*  The VE noted that even the simplest jobs would have at least two, three, or four steps, so it would be difficult to parcel that down to steps.  *Id.*  Plaintiff's attorney asked if the VE would agree that two steps are considered with SVP 1 jobs only and not SVP 2 jobs.  *Id.*  The VE stated that she would not necessarily agree, as sometimes an SVP 1 job could have many steps, and that in the case of the machine feeder, an individual would need to get a box, put an item in a box, check to be sure that items were coming out of the machine at the same pace that they were being put into the machine, and then take the box and put it off to the side.  AR 72-73.  The VE testified that two-step job definitions and numbers would depend on what constituted a step.  AR 73.  The VE then

testified that if the hypothetical individual needed to have supervision every 30 minutes to be reminded to stay on task, there would be no competitive work and that would be more like needing a job coach. *Id.*

**Medical Record**

The relevant medical record was reviewed by the Court and will be referenced below as necessary to this Court's decision.

**The ALJ's Decision**

Using the Social Security Administration's five-step sequential evaluation process, the ALJ determined that Plaintiff was not disabled under the Social Security Act. AR 29-49. Specifically, the ALJ found that Plaintiff has not engaged in substantial gainful activity since September 18, 2020, the application date. AR 34. The ALJ identified the following severe impairments: depressive disorder, autism spectrum disorder, and learning disorder. AR 35. The ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled any of the listed impairments. AR 35-36.

Based on a review of the entire record, the ALJ found that Plaintiff retained the RFC to perform a full range of work at all exertional levels with the nonexertional limitations that Plaintiff: retained the mental residual capacity to carry out unskilled work involving simple, routine, repetitive tasks and that allows for a regular work break approximately every 2 hours (the first break of approximately 15 minutes, a second break of approximately 30 minutes, and a third break of approximately 15 minutes); retained the social interaction ability to perform work that involves working primarily with things rather than people; and retained the ability to deal with routine changes and stressors associated with the work described in this RFC. AR 36-37. The ALJ considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," as well as "medical opinion(s) and prior administrative medical finding(s)." AR 37.

The ALJ found that Plaintiff had no past relevant work, was defined as a younger individual on the date the application was filed and had a limited education. AR 43. Given Plaintiff's age, education, work experience, and RFC, the ALJ found that there were jobs that existed in significant

numbers in the national economy that Plaintiff could perform.  AR 43-44.  THE ALJ noted that examples of jobs consistent with Plaintiff's age, education, work experience, and RFC included: (1) Packager (DOT No. 920.587-018, SVP 2, unskilled, medium exertional level, with 530,000 jobs in the national economy); (2) Machine Feeder (DOT No. 569.686-042, SVP 1, unskilled, medium exertional level, with 10,000 jobs in the national economy); and (3) Machine Off Bearer (DOT No. 920.685-074, SVP 2, unskilled, medium exertional level, with 314,000 jobs in the national economy).  *Id.*  The ALJ therefore concluded that Plaintiff had not been disabled from the application date of September 18, 2020.  AR 44.

## SCOPE OF REVIEW

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, this Court must determine whether the decision of the Commissioner is supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401.  The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion.  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must apply the proper legal standards.  *E.g., Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the Commissioner's determination that the claimant is not disabled if the Commissioner applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence.  *See Sanchez v. Sec'y of Health and Human Servs.*, 812 F.2d 509, 510 (9th Cir. 1987).

## REVIEW

In order to qualify for benefits, a claimant must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 1382c(a)(3)(A).  A claimant must show that he or she has a physical or mental impairment of such

severity that he or she is not only unable to do his or her previous work, but cannot, considering his or her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989). The burden is on the claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

## **DISCUSSION**[2]

Plaintiff first argues that the ALJ failed to provide clear and convincing reasons for discounting Plaintiff's subjective symptoms. (Doc. 15 at 16-20.) Plaintiff next contends that the ALJ erred in considering the medical opinion of Dr. L. Faurbo. (*Id.* at 20-23.)

**A. Plaintiff's Subjective Complaints**

Plaintiff contends that the ALJ committed harmful error by failing to provide clear and convincing reasons for rejecting Plaintiff's testimony as inconsistent with the evidence. (Doc. 15 at 16-20; Doc. 20 at 1-4.) In deciding whether to admit a claimant's subjective complaints, the ALJ must engage in a two-step analysis. *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014); *Batson v. Comm'r*, 359 F.3d 1190, 1196 (9th Cir. 2004). First, the claimant must produce objective medical evidence of her impairment that could reasonably be expected to produce some degree of the symptom or pain alleged. *Garrison*, 759 F.3d at 1014. If the claimant satisfies the first step and there is no evidence of malingering, the ALJ may reject the claimant's testimony regarding the severity of her symptoms only by offering specific, clear and convincing reasons for doing so. *Id.* at 1015.

Here, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms. AR 40. However, the ALJ discounted Plaintiff's statements concerning the intensity, persistence, and limiting effects of those symptoms, noting that the statements were not consistent with medical evidence and other evidence in the record. *Id.* The ALJ was therefore required to provide specific, clear and convincing reasons for discounting Plaintiff's subjective complaints.

---

[2] The parties are advised that this Court has carefully reviewed and considered all of the briefs, including arguments, points and authorities, declarations, and/or exhibits. Any omission of a reference to any specific argument or brief is not to be construed that the Court did not consider the argument or brief.

First, the ALJ noted that the symptoms testified to by Plaintiff and his great aunt were inconsistent with the evidence in the record. AR 40-41. The ALJ summarized Plaintiff's testimony:

> At the hearing, the claimant testified that he had problems with understanding and memory, but he could not explain how. He said that he has social difficulties, and that he has trouble with concentration. The claimant acknowledged that he has never worked. He receives counseling at Central Valley because he cannot function on his own, without help. Explaining further, he said that he needs help with getting skills for a job. He said that he could perform personal hygiene and getting dressed [by himself]. The claimant does not have a driver's license, and he has not attempted to obtain one. He agreed that he needed someone to guide him, to help him know what to do. Every day, he receives such help from his family.

AR 38. The ALJ further summarized Plaintiff's great aunt's testimony as stating in part that:

> [Plaintiff] is antisocial, and he does not like to talk to others, especially when anxious. He will not initiate conversation. She explained that she worried that he could not take care of himself if something happened to her and her mother (the claimant's grandmother). The claimant takes medications prescribed by his psychiatrist, whom he started seeing about a year ago… The claimant has problems getting things done on time, and he appears to understand directions but does not carry them out. He has no initiative, and he has comprehension problems. At home, the claimant has chores, and he has to be constantly reminded to do them. When he does them, he does so at his own pace. On a typical day, the claimant has to be reminded 5-10 times to do something, but with reminders, he returns to his task for about 30 minutes. The claimant does not always articulate things correctly, and he gives up easily if he is not understood, she testified.

AR 38.

In discounting Plaintiff's and his great aunt's testimony, the ALJ found that the testimony that that Plaintiff was incapable of functioning independently "is not consistent with the assessment of the claimant's IEP team (8F), or even more discrete assessments within 9F (the claimant does household chores and completes many self-care tasks, with some supervision needed for some activities)." AR 40. The ALJ further noted that within "the context of simple work in a low-social environment to reduce stress, the claimant's deficits do not preclude work activity" and noted that Plaintiff "functioned relatively independently in the context of his high school campus, with some provision made for cognitive limitations." AR 40-41. In support, the ALJ cites Exhibits 8F, consisting of

Plaintiff's records and IEP reports from Porterville Unified School District and 9F, an Individual Program Plan report from Central Valley Regional Center. AR 40-41, 498-793, 794-799.

The ALJ does not identify specific IEP assessments within the 296-page Exhibit 8F that support discounting the symptoms testimony. *See* AR 40-41. A review of these records does not show that the ALJ provided specific, clear and convincing reasons for discounting Plaintiff's subjective complaints. Instead, the records appear in line with the symptoms testimony that Plaintiff had difficulties completing assignments on time and required significant support, monitoring, and reminding to complete tasks. For example, Plaintiff received significant support including accommodations allowing extended time to complete tasks, clarification of directions, verification of complete class notes prior to quizzes and tests, reminders to turn in homework, use of notes on assignments and tests, reduced assignments where only half of an assignment was to be completed, and use of repetition and visual aids to improve attention and memory. AR 501; 502 (from August 2021 to August 2022, Plaintiff received special education including specialized academic instruction "3 or 4 days a week to complete coursework with assistance," received monthly psychological services for "Social skills, coping skills, functional communication, self-advocacy skills"); 553 (Specialized Academic Instruction for 235 minutes daily was offered beginning September 4, 2020); 560-61 (noting Specialized Academic Instruction for "3 or 4 days a week to complete coursework for assistance" from start date June 3, 2021 to end date June 3, 2022 and Specialized Academic Instruction with "RSP ELA class… on add block schedule days (2 days a week) for 145 minutes daily and for 35 minutes on Wednesdays").

Additionally, assessments showed that Plaintiff had difficulties in timely turning in or finishing assignments. An August 2021, IEP report noted that Plaintiff's "disability of Autism and Other Health Impairment impedes progress in the general education curriculum" and that the disabilities affect "his ability in the areas of reading comprehension, written expression, functional math skills, social/emotional learning, executive function skills, and communication at the same pace as his typically developing peers." AR 503. While Adaptive/Daily Living Skills and Vocational assessments noted that Plaintiff could follow a schedule, could navigate the campus, followed

expectations and school rules, transitioned between tasks, and had good attendance, the Vocational assessment noted that he needed "to work on meeting the deadlines by turning in assignments completed and on time." AR 508. The Vocational assessment noted that attendance and punctuality was "not an area of concern at this time except for meeting deadlines and turning in his classwork/or a grade." *Id.* The Social and Emotional Behavioral assessment also noted that Plaintiff would "often not collaborate or participate in group discussions" and that when "asked if he needs help he will not respond or get a little upset by sighing and turning away from the teacher" and when upset, he would "say things about adult or peer under his breath at his desk." AR 507-08. Teachers' reports frequently included notes that Plaintiff was not meeting deadlines or turning in assignments and needed further support. *See* AR 506 (mostly "below standard" marks in English/Language Arts Overall and Math); 603 (Academic Support Teacher Input: "This class is designed for Thomas to get missing work done or to keep up on his class work in all of his classes. At times he will do his classwork/follow the rules and at times he will refuse by sleeping in class or just sit in desk and not work"; Ag. Mech Teacher Input: Plaintiff "needs to finish work and turn it in/or a better grade. He is missing 3 assignments"; Math Teacher Input: "Teacher reports that she has started to reduce his classwork and quizzes/tests to half of what everybody else is doing. He is doing much better with this support. Needs to continue to complete work and ask for help if needed"; Phys Sci Teacher Input: "Thomas stays focused during note taking and is always on time to doss. Thomas will at times leave his classwork/notes incomplete, usually will not actively collaborate with his group during group work."); 673 (November 2020 meeting summary with teacher reporting that Plaintiff had not met his reading and writing goals for the year and had an F in SPED LA class due to lack of attendance, not turning in classwork, and not asking for help when needed"); 675 (November 2020 meeting summary in which Plaintiff's math teacher reported that Plaintiff "needed a lot of repetition of instructions, and it was hard to get him to produce any work or turn in anything. Would need to be right there with him to get production of any work. liked to just sit, chill listen and observe while in class."). Though the IEP and school-based assessments in Exhibit 8F show Plaintiff has some level of functioning, they do not conflict with the symptoms testimony that Plaintiff had problems with completing tasks on time, appeared to

understand directions but would not carry them out, required multiple reminders to stay on task before he would again become distracted, and would give up easily if he was not understood. *See* AR 38.

Furthermore, the assessments in the Exhibit 9F Individual Program Plan discussed by the ALJ do not support a discounting of the symptoms testimony. AR 38, 794-799. The Individual Program Plan discusses some of Plaintiff's basic abilities, but also shows that he required regular support and prompting to accomplish many simple tasks. For instance, the plan stated that "Thomas will continue to maintain his home by doing household chores as determined by his aunts, which are appropriate." AR 796. The report further noted that Plaintiff "is able to complete many of his self-care tasks but requires monitoring or prompts." *Id.* The report also stated that while Plaintiff can serve himself, cook, use the microwave, and help with food preparation, he needs supervision when using the stove and does not use the oven. *Id.* The report found that Plaintiff could dress himself and understood basic "stranger dangers," but needed assistance with managing his medication, needed prompting or monitoring for hygiene and bathing, and preferred to isolate rather than socialize. *Id.* The report also noted that he would need guidance on large purchases and budgeting in relation to money management. *Id.* Given the level of support required in performing basic tasks, the Individual Program Plan cited by the ALJ does not conflict with the symptoms testimony that Plaintiff had issues with accomplishing tasks in a timely manner and required significant support to complete tasks. The ALJ therefore did not appropriately discount the symptoms testimony based upon an inconsistency with the medical evidence.

Defendant contends that other objective medical evidence indicated that the ALJ reached a reasonable conclusion in discounting the symptoms testimony, suggesting as an example that evidence showed that findings related to Plaintiff's concentration were relatively normal. (Doc. 19 at 3.) However, the evidence now cited by Defendant differs from the supporting evidence cited by the ALJ in discounting Plaintiff's testimony. *See* AR 40-41 (citing Exhibit 8F and 9F), 297, 322, 330, 399, 402, 417, 422, 425, 429. The Ninth Circuit has noted that "[l]ong-standing principles of administrative law require us to review the ALJ's decision based on the reasoning and factual findings offered by the ALJ—not post hoc rationalizations that attempt to intuit what the adjudicator may have

been thinking." *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1225 (9th Cir. 2009). Defendant's citations to portions of the record that were not cited by the ALJ amounts to a post hoc rationalization. This argument therefore does not support Defendant's contention that the ALJ appropriately considered the symptoms testimony as inconsistent with the cited record.

Second, the ALJ's reasoning suggests that the ALJ found that Plaintiff's subjective symptoms and difficulties were inconsistent with his relatively intact daily activities. AR 40-41. An ALJ may properly discount a claimant's subjective complaints when the daily activities demonstrate an inconsistency between what the claimant can do and the degree that disability is alleged. *Molina v. Astrue*, 674 F.3d 1104, 1112–13 (9th Cir. 2012) (an ALJ may consider "whether the claimant engages in daily activities inconsistent with the alleged symptoms"), superseded by regulation on other grounds (identifying two-step analysis in assessing the credibility of a claimant's testimony regarding the subjective pain or intensity of symptoms). Even where a plaintiff's activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment. *Id*. at 1113.

In assessing Plaintiff's daily activities, the ALJ noted:
> [The symptoms testimony and claimant's citation of Exhibit 9F] is not consistent with the assessment of the claimant's IEP team (8F), or even more discrete assessments within 9F (the claimant does household chores and completes many self-care tasks, with some supervision needed for some activities)… The claimant functioned relatively independently in the context of his high school campus, with some provision made for cognitive limitations.

AR 40-41.

As discussed above, however, the assessments in Exhibit 9F show that Plaintiff required support and prompting to accomplish many simple tasks. *See* AR 796 (Plaintiff was "able to complete many of his self-care tasks but requires monitoring or prompts," needed supervision when using the stove, needed assistance with managing his medication, needed prompting for hygiene and bathing, and would need guidance on large purchases and budgeting related to money management). Additionally, while the assessments in Exhibit 8F show that Plaintiff was generally able to move from class to class and attend classes, he did not function relatively independently, as he did not participate

in class and regularly received support so that he could complete assignments. AR 501 (Program Accommodations from August 2021 to August 2022 included "Extended time to complete tasks (assignments, quizzes, tests), clarification of directions, verification of complete class notes prior to quiz/test, reminder to turn in homework… use of notes on assignments and tests, separate setting for test, breaks as needed, reduced assignments (half of an assignment to be completed only), speech to text and text to speech access, use repetition and visual aids to improve attention and memory, positive personal comments when interest and completion of work has been initiated,… encourage to turn in work to be able to participate in the workability program."); 502 (from August 2021 to August 2022, Plaintiff received special education including specialized academic instruction "3 or 4 days a week to complete coursework with assistance," received monthly psychological services for "Social skills, coping skills, functional communication, self-advocacy skills"); 507-08 (noting in assessments that, while Plaintiff was usually on time for classes and respectful of rules, he "needs to work on meeting the deadlines by turning in assignments completed and on time. Work completion goal will be written to address this need. He has academic support class to help him with turning in assignments on time."); 553 (Specialized Academic Instruction for 235 minutes daily was offered beginning September 4, 2020); 560-61 (noting Specialized Academic Instruction for "3 or 4 days a week to complete coursework for assistance" from start date June 3, 2021 to end date June 3, 2022 and Specialized Academic Instruction with "RSP ELA class… on add block schedule days (2 days a week) for 145 minutes daily and for 35 minutes on Wednesdays"); 603 (input from teachers that Plaintiff had problems with finishing assignments on time); 673 (November 2020 meeting summary with teacher reporting that Plaintiff had not met his reading and writing goals for the year and had an F in SPED LA class due to lack of attendance, not turning in classwork, and not asking for help when needed"); 673 (November 2020 meeting summary noting that during speech language test, Plaintiff needed "reminders to open his mouth… in order to hear him more clearly," "knows how to speak; he just needs reminders of how to articulate," and "Struggles with comprehension and asks to repeat many times what was said in the testing session"); 675 (November 2020 meeting summary in which Plaintiff's math teacher reported that Plaintiff "needed a lot of repetition of instructions, and it was hard to get him to produce any work or turn in anything. Would need to be right there with him to get

production of any work. liked to just sit, chill listen and observe while in class."). While the assessments and reports in the cited records show that Plaintiff has some capacity to attend classes and function, they do not contradict the key symptoms testimony that Plaintiff could not timely complete assignments, could understand directions but not carry them out, and required multiple reminders to stay on task before he would again become distracted.  AR 38.  The ALJ therefore did not appropriately use an inconsistency between Plaintiff's daily activities and limitations alleges to discount the symptoms testimony.

Defendant argues that Plaintiff's inability to function on his own was discounted by Plaintiff's own testimony.  (Doc. 19 at 3-4); AR 399 (December 2020 exam report noting "claimant denied having limitations due to mental health and/or cognitive problems. No significant difficulties with shopping, self care, or independent living. Claimant is independent for basic ADL's and does not need help with preparing meals or doing light household chores. Claimant is able to make change at the store.")  However, the report now used by Defendant does not appear in the ALJ's reasoning for discounting the symptoms testimony.  *See* AR 40-41.  The ALJ simply wrote that the symptoms testimony that Plaintiff could not function independently "was not consistent with the assessment of the claimant's IEP team (8F), or even more discrete assessments within 9F… The claimant functioned relatively independently in the context of his high school campus, with some provision made for cognitive limitations." *Id*.  The use of another report therefore appears to be impermissible post hoc rationalization.  *Bray*, 554 F.3d at 1225.  Because the Court is limited to reviewing the ALJ's decision based on the reasoning and factual findings offered by the ALJ in support of discounting the symptoms testimony, this argument does not support Defendant's contention that the ALJ appropriately discounted the symptoms testimony based upon a conflict between Plaintiff's reported activities and claimed limitations.

Accordingly, the Court finds that the ALJ erred in discounting the symptoms testimony.

**B. Remedy**

The decision whether to remand for further proceedings or order an immediate award of benefits is within the Court's discretion. See *Harman v. Apfel*, 211 F.3d 1172, 1175-78 (9th Cir. 2000).  Unless "the record has been fully developed and further administrative proceedings would serve no

useful purpose," remand for further proceedings is warranted. *Garrison v. Colvin*, 759 F.3d 995, 1020 (9th Cir. 2014). As it is not clear that "further administrative proceedings would serve no useful purpose," remand for further proceedings is appropriate. *Id.*; *see also Dominguez v. Colvin*, 808 F.3d 403, 407 (9th Cir. 2015) ("A district court may reverse the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing, but the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.") (internal quotes and citations omitted). On remand, the ALJ should address whether Plaintiff's symptoms testimony is adequately supported or whether there are specific, clear and convincing reasons for rejecting Plaintiff's symptoms testimony.

Having found that remand is warranted, the Court declines to address Plaintiff's remaining arguments concerning whether the ALJ erred in considering Dr. Faurbo's medical opinion. *See Hiler v. Astrue*, 687 F.3d 1208, 1212 (9th Cir. 2012) ("Because we remand the case to the ALJ for the reasons stated, we decline to reach [plaintiff's] alternative ground for remand."); *see also Augustine ex rel. Ramirez v. Astrue*, 536 F.Supp.2d 1147, 1153 n.7 (C.D. Cal. 2008) ("[The] Court need not address the other claims plaintiff raises, none of which would provide plaintiff with any further relief than granted, and all of which can be addressed on remand."); *Marcia v. Sullivan*, 900 F.2d 172, 177 n.6 (9th Cir. 1990) ("Because we remand for reconsideration of step three, we do not reach the other arguments raised."); *Pendley v. Heckler*, 767 F.2d 1561, 1563 (11th Cir. 1985) (per curiam) ("Because the 'misuse of the expert's testimony alone warrants reversal,' we do not consider the appellant's other claims.").

///
///
///
///
///
///
///
///

**CONCLUSION AND ORDER**

Based on the foregoing, the Court finds that the ALJ's decision was not supported by substantial evidence in the record as a whole and was not based on proper legal standards. Accordingly, IT IS HEREBY RECOMMENDED as follows:

1. Plaintiff's motion for summary judgment (Doc. 15) be GRANTED;
2. Defendant's cross-motion for summary judgment (Doc. 19) be DENIED;
3. Plaintiff's appeal from the administrative decision of the Commissioner of Social Security be GRANTED and the agency's determination to deny benefits be REVERSED; and
4. The Clerk of this Court be directed to enter judgment in favor of Plaintiff Thomas Stephen Drummond and against Defendant Martin O'Malley, Commissioner of Social Security.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, as required by 28 U.S.C. § 636(b)(l). Within fourteen (14) days after being served with these findings and recommendations, the parties may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The parties are advised that the failure to file objections within the specified time may result in the waiver of the "right to challenge the magistrate's factual findings" on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **May 16, 2024**          /s/ Barbara A. McAuliffe
                                 UNITED STATES MAGISTRATE JUDGE